IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WILLIAM SCHNEIDER, DAVID SCHWANINGER, and DEWANE SPILKER,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | 8:99CV315<br><br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on defendant United States of America's (the Government") motion for partial summary judgment, Filing No. 490. This is a takings action under the National Trails System Act, 16 U.S.C. §§ 1241–1251. This Court has jurisdiction under 28 U.S.C. § 1346(a)(2) (the "Little Tucker Act").[1]

I.  BACKGROUND

A.  Procedural History

The "Rails-to-Trails Act," 16 U.S.C. § 1247(d), permits the conversion of disused railroad corridors into trails for hiking, biking, and other recreational activities. Plaintiff William Schneider filed this action in 1999, alleging, on his behalf and on behalf of others similarly situated, a taking of private property for public use without just compensation in violation of the Fifth Amendment, in the Government's issuance of Notices of Interim Trail

---

[1] The Tucker Act provides jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract. *See* 28 U.S.C. § 1491(a)(1) (1982 ed.). The Little Tucker Act, 28 U.S.C. § 1346(a)(2), creates concurrent jurisdiction in the district courts for such claims not exceeding $10,000 in amount. A taking is founded on the Constitution and is within this Court's jurisdiction. *See Preseault v. I.C.C.*, 494 U.S. 1, 11-12 (1990) ("*Preseault I*").

1

Use or Abandonment ("NITUs") for 15 rail corridors in Nebraska. He filed a second amended class action complaint on July 2, 2003.

On July 21, 2000, this Court certified a statewide class action under Rule 23(b)(3) on behalf of:

> All persons who own an interest in land constituting a railroad corridor in the State of Nebraska, and which is now occupied or controlled for trail use pursuant to the National Trails System Act, and who have been damaged in the amount of $10,000 or less by being deprived of their rights to possession, control, and enjoyment of their land as a result of a Trail Use Order, or who waive claims exceeding $10,000. This class is certified for the limited purpose of determining whether and under what circumstances an unconstitutional taking occurred. This class excludes railroad companies and their successors in interest; persons who have filed, intervened, or choose to intervene or opt into separate lawsuits against the United States for compensation in the same interests in land.

Filing No. 75, Mem. and Order at 15-16. The class action was certified for the limited purpose of determining "whether the Rails-to-Trails Act, which is an act of Congress, constitutes taking of private land for public use, which necessarily involves questions of abandonment and whether interim trail use is considered a railroad purpose and/or use." Filing No. 75, Memorandum and Order at 7. The Court's certification order expressly left title issues and damages to individual determination. *Id.* at 10.

In 2003, the Court ruled on the parties' cross-motions for summary judgment on the takings issue. Filing No. 216, Memorandum and Order. The Court held that federal law governs the issue of abandonment and the Rails-to-Trails Act "requires that interim trail use be treated like a discontinuance rather than an abandonment." *Id.* at 10. The Court found "the Rails-to-Trails Act, and the procedures set forth therein, preclude the finding of abandonment in circumstances where a railroad holds a right-of-way as an easement and then applies for a NITU" from the Surface Transportation Board ("STB"), but "the imposition of a new easement, a 'linear park,' via the Rails-to-Trails Act, results

in a compensable taking from class members who own land adjacent to the rights-of-way held by easement, regardless of whether the railroads abandoned those rights-of-way." *Id.* at 10-11. The Court concluded that the use of a railroad right-of-way as a recreational trail "constitutes a new easement that entitles the landowners to reasonable compensation." *Id.* at 14. The Court found the appropriate measure of compensation would be the damages that the plaintiffs' property sustained by the new use, if any, over and above the damages caused by the previously authorized use.[2] *Id.* at 16. The Court later denied motions reconsider its ruling on the abandonment issue and to modify to its measure-of-damages determination. Filing No. 226, Motion to Reconsider, Filing No. 240, Memorandum and Order; Filing No. 347, Motion for Judgment and determination of measure of damages; Filing No. 358, Memorandum and Order.

The parties thereafter in 2017 jointly moved to decertify the class and for approval of a plan to notify potentially eligible plaintiffs in order to resolve individual claims. *See* Filing No. 422, Joint Motion; Filing No. 423, Brief. Noting that the Court had determined the issue common to the class, the parties advocated for a joinder mechanism to efficiently resolve the plaintiffs' claims, stating that valuation issues were unique to each parcel. Filing No. 423, Brief at 1, 13.[3] The parties outlined their efforts to determine

---

[2] The Court further found there was no compensable taking with respect to class members whose land adjacent to a trail was acquired by the railroad in fee simple and granted summary judgment to the Government on claims that related to parcels of land that had been acquired by the railroad via land grants from the Federal government in 1856 or 1864. Filing No. 216, Memorandum and Order at 18-19.

[3] The parties argued that in order to "find a taking giving rise to liability under the Fifth Amendment in a rails-to-trails case, the court must perform a three-part analysis outlined by the Federal Circuit in *Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ('*Preseault II*')[,]" and, under that test, "[t]o prevail, a plaintiff must demonstrate that the railroad held only an easement, rather than a fee simple estate, on plaintiff's property, and that either the easement did not encompass future use as a public recreational trail or that it terminated prior to the alleged taking." Filing No. 343, Brief at 2.

ownership and valuation of the rail corridor-adjacent parcels, including reviewing deeds and hiring an appraiser. *Id. a*t 9-10. They also stated that the Court had resolved issues involving whether certain categories of deeds conveyed easements or fee interests based on state law but noted that some issues regarding the interpretation of particular deeds remained outstanding. *Id.* at 9 n.5. The parties stated they had been unable to agree on how to handle the seven temporary-takings trails where a NITU issued but no trail use agreement was reached. *Id*. at 10; *see also* Filing No. 331, Memorandum and Order; Filing No. 343, Status Report at 2-3. In discussing those remaining issues, the parties stated they were reviewing the recent Federal Circuit decision in *Caquelin v. United States*, 697 Fed. Appx. 1016 (Fed. Cl. 2017) ("*Caquelin I* Appeal").[4] Filing No. 423 at 3.

Along with the decertification motion, the parties also submitted a Joint Case Management Plan ("the Plan"). Filing No. 425. As relevant herein, the Government stated the parties would first resolve title and mapping issues under the appraisal and valuation methods followed with respect to claims where a trail agreement had been reached, and would then address eligibility and compensation for the temporary-takings trails. *Id*. at 5. The parties indicated that the Government anticipated seeking discovery under the multi-factor approach set out in *Arkansas Game & Fish Comm'n v. United*

---

[4] As discussed *infra* at 16-17*,* that case was an appeal of the Federal Court of Claims finding in *Caquelin v. United States*, 121 Fed. Cl. 658, 666 (2015) ("*Caquelin I*"), that a *per se* physical taking had occurred where a NITU issued and was in place for a six-month period, but no trail use agreement was ultimately reached. The Federal Circuit vacated and remanded the action for more findings. *Caquelin I* Appeal, 697 Fed. Appx. at 1020. Subsequently, the Court of Claims reached essentially the same decision on remand, applying both a *per se* takings and regulatory takings analysis. *Caquelin v. United States*, 140 Fed. Cl. 564, 578-80 (Fed. Cl. 21018) ("*Caquelin II*"), *appeal docketed*, No. 2019-1385 (Fed. Cir. Jan. 9, 2019) ("*Caquelin II* Appeal"). The Government's appeal was recently argued. *Id.,* No. 19-1385, Docket Entry 121, *submitted after oral arg.* (Fed. Cir. Mar. 5, 2020).

*States*, 568 U.S. 23, 38–40 (2012),[5] and in *Penn Central Trans. Co. v. City of New York*, 438 U.S. 104, 124 (1978),[6] and "[o]nce the parties have had the opportunity to review the potentially eligible parcels along trails where no trail use agreement has been reached, they will develop a proposed plan and schedule for resolving issues regarding liability and just compensation for these trails." *Id.* The Court granted the decertification motion and approved the Plan on September 19, 2019. Filing No. 426.

Following decertification of the class, the plaintiffs filed an amended complaint identifying the individual claimants along the applicable rail corridors. Filing No. 438, Amended Complaint; *see also* Table of Trails and Date of Ownership ("Trails Table"), ECF No. 424-3. Since then, the parties have filed status reports detailing efforts to map and appraise the parcels of land along the corridors and to evaluate the value of the claims. *See, e.g.*, Filing Nos. 432, 442, 444, 448, 461, 469, 471, 473, 475, 477. A task list submitted to the Court on November 16, 2018, indicated, with respect to the three trails at issue, that the parties anticipated that appraisal and negotiation for settlement would be completed by June 25, 2019. Filing No. 458-1. On August 16, 2019, the parties informed the Court that they did not anticipate the need for appraisal work on Trails, 6, 9, 11, and 13 in order to reach a settlement, but alluded to a need for Court involvement. Filing No. 480, Status Report at 3-4.

B. The Parties' Arguments

---

[5] In *Arkansas Game*, in the context of repeated controlled flooding for water management purposes, the Supreme Court found "simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." *Id.*, 568 U.S. at 38.

[6] In *Penn Central*, the Supreme Court applied what is "essentially [an] ad hoc, factual inquir[y]," in a regulatory takings case. *Penn Central*, 438 U.S. at 124. *Penn Central* listed three factors to be considered in determining if a non-categorical taking occurred: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment backed expectations;" and (3) "the character of the government action." *Id.*

5

The Government now moves for partial summary judgment on the claims of temporary taking filed by plaintiffs Roland J. Saathoff; Gary A. Vocasek; Ronald D. Ostdiek, Dolores J. Morrison, and Saundra A. Ostdiek with respect to Trails 6, 9, and 11. It first argues that the issuance of the NITUs on Trails 6, 9, and 11 was not a taking of these plaintiffs' property. In connection with that argument, it contends these plaintiffs cannot prove an element of their claims—that the NITUs caused them damage. It next argues that these plaintiffs cannot establish that a taking has occurred under the multi-factor balancing test set out in *Arkansas Game,* 568 U.S. at 38-40.

In response, the plaintiffs argue that it is well established that a temporary taking is compensable. They also argue that *Arkansas Game* has been interpreted narrowly and does not apply to a *per se* taking. Further, they argue the Government should be estopped from now arguing that there has been no taking, because it argued to the contrary earlier in this action.

The Government replies that it does not raise the arguments it raises in *Caquelin* and reiterates its argument that the plaintiffs have failed to prove an element of their claims.

C. Facts

The parties have generally agreed to each other's respective substantive statements of undisputed fact. *See* Filing No. 491, Defendant's Brief at 9-12; Filing No. 499, Plaintiffs' Brief at 2-4, Filing No. 503, Defendant's Brief at 2-3. The parties have identified (1) Roland J. Saathoff; (2) Gary A. Vocasek; and (3) Ronald D. Ostdiek, Dolores J. Morrison, and Saundra A. Ostdiek ("the Ostdieks") as claimants potentially eligible for

just compensation for Trails 6, 9, and 11. These are the only landowners presently eligible for compensation along those trails. See Filing No. 491, Defendant's Brief at 9 n.3.

With respect to Trail 6, the parties agree that the Trail 6 rail corridor is a 1.8-mile segment of a rail line formerly operated by the Union Pacific Railroad Company ("U.P.") that extends from milepost 17.6, near Papillion, Nebraska, to milepost 19.4 in Sarpy County, Nebraska. In an abandonment proceeding, the Interstate Commerce Commission ("ICC"), the STB's predecessor, accepted the request of Nebraska Trails Council for the imposition of interim trail use/rail banking under the Trails Act, and issued a NITU covering the entire line. See Interstate Commerce Comm'n, Surface Transportation Board (S.T.B.), Docket No. AB-33 (Sub-No. 85X), *Union Pacific Railroad Company—Abandonment Exemption—in Sarpy County, NE*, 1994 WL 156229, at *1 (I.C.C. April 20, 1994). The ICC set a 180-day period for the negotiation of a trail use agreement, and stated that if no agreement was reached, UP could fully abandon the line, noting that "[u]se of the right-of-way for trail purposes is subject to restoration for railroad purposes." *Id.*

No trail use agreement was ever reached. Prior to the expiration of the NITU, Union Pacific sent a letter to the STB indicating its intent to abandon the rail line. Filing No. 492-2, Index of Evid., Ex. 1, June 13, 1994 Letter. The STB has no record regarding whether the line was formally abandoned and was never asked to determine that issue.

Based on the documents submitted by individual claimants and the parties' experts' determinations, the parties have identified one property on Trail 6 that is potentially eligible for just compensation, meaning that the railroad acquired an easement over the property, but did not own the land underlying the rail corridor in fee. That parcel

7

is identified by the Sarpy County Assessor's Office as Parcel Number 010565578. Filing No. 492-3, Ex. 2, Sarpy County Assessor's Real Property Record Card. The address of the property is 751 W. 6th St., Papillion, NE 68046.

Roland J. Saathoff is the Trustee of the Glen L. Gosch Family Trust, and the property was deeded to the trust on March 31, 2012. The property has been used by a tenant—-a landscaping company—for storage. In answer to an interrogatory asking how the issuance of the NITU interfered with the use of the property by the tenant, Saathoff stated that he was not aware of any interference. Filing No. 492-4, Ex. 3, Roland Saathoff Answers to Interrogatories at 3. In his Answers to Interrogatories, Saathoff indicates that other documents, including leases, maps, surveys and the affidavits of Saathoff's father-in-law, Glen L. Gosch, regarding the rail corridors were produced to the Government in this action. Id. at 2-4. Saathoff states he:

> has knowledge [about the Railroad Corridor adjacent to the Property] from his discussions with his father-in-law, Glen L. Gosch, who owned the Property since the 1960s. Mr. Saathoff has also reviewed documents related to the Property. Mr. Saathoff was aware of the Railroad Corridor and the communications between the Railroad and owners and also the Affidavits filed by Glen Gosch regarding Abandon Railroad right of way in the area.

Id. at 2.

With respect to Trail 9, the parties agree that the Trail 9 rail corridor is a 22.9-mile segment of a rail line, formerly operated by the Burlington Northern Railroad Company ("B.N."), extending from milepost 0.33, near DeWitt, Nebraska, to milepost 23.26, near Tobias, Nebraska. *See* Interstate Commerce Comm'n, *Decision and Notice of Trail Use or Abandonment*, Docket No. AB-6 (Sub-No. 376X), 1996 WL 263167, at *1 (STB May 20, 1996); *see also* Table of Trails and Date of Ownership ("Trails Table"), ECF No. 424-3. The STB issued a NITU on May 20, 1996. The NITU established a 180-day period for

the negotiation of a trail use agreement. *Id.* at *2. No trail use agreement was ever reached. The STB has no record regarding whether the line was formally abandoned and was never asked to determine that issue.

The parties have identified one property on Trail 9—Saline County Assessor's Office Parcel Number 760088985—that is potentially eligible for just compensation. *See* Filing No. 492-5, Ex. 4, Saline County Parcel Identification Information. The address of the property is 2160 County Rd. V, DeWitt, NE 68341. The record shows Gary Vocasek obtained title to the property on January 26, 2000 when it was conveyed to him by his father, Edward Vocasek, and his father's wife, Dorothy A. Vocasek. Filing No. 492-6, Ex. 5, Gary Vocasek's Answers to Interrogatories at 1. Edward Vocasek retained a life estate in the property until his death on April 24, 2007, when Gary Vocasek inherited all interests in the property. *Id.* The property has been in Gary Vocasek's family since May 28, 1938, when it was purchased by Vocasek's great grandparents. *Id.* Gary Vocasek uses his property for agricultural production. *Id.* at 2. Regarding knowledge of the railroad corridor and its ownership, Gary Vocasek states:

> The Railroad Corridor lay through the Property for as long as Plaintiff Gary Vocasek can remember and Mr. Vocasek and his father farmed around it. In the late 1990s there was an effort made by property owners adjacent to the Railroad Corridor to acquire the Railroad Corridor from the railroad company. Adjacent owners retained counsel and contributed money to a fund to purchase the Railroad Corridor and they made an offer to the railroad company. The railroad company accepted the offer and sold its interests in the railroad corridor that ran through The Property to Plaintiff in 1998. The railroad company removed all rails, ties, and ballast within the Railroad Corridor and turned the Corridor over to Plaintiff Gary Vocasek in an "as is" condition.

*Id.* at 2. Vocasek, also answered that he was not aware of interference with the property in answer to an interrogatory. *Id.* at 3 (Interrog. No. 8).

9

With respect to Trail 11, the parties agree that the Trail 11 rail corridor is a 42.13-mile segment of a rail line, formerly operated by B.N., that extends from milepost 45.50, near Shickley, Nebraska, to milepost 86.63, near Blue Hill, Nebraska. *See* Surface Transportation Board, Docket No. AB-6 (Sub-No. 371X), *Decision and Notice of Trail Use or Abandonment*, 1996 WL 297093, at *1 (STB June 6, 1996); *see also* Filing No. 424-3, Trails Table. On June 6, 1996, the STB issued a NITU, establishing a 180-day period for the negotiation of a trail use agreement. No trail use agreement was ever completed for the rail line. The STB has no record of a determination that the rail line was formally abandoned.

The parties have identified one property on Trail 11 that is potentially eligible for just compensation—Nuckolls County Assessor's Office Parcel Number 0006034.00. Filing No. 492-7, Ex. 6, Nuckolls County Assessor's Office Parcel Identification Information. The address of the property is Farm 2198, PT SW ¼ 9-4-8, Lawrence, NE 68957. *Id.*

The record shows that Ronald Ostdiek inherited the property from his father, Ernest Ostdiek, in October 1992. Filing No. 492-8, Ex. 7, Ronald Ostdiek's Answers to Interrogatories at 1. Ronald Osdiek's parents originally acquired the property in 1953. *Id.* In his Answers to Interrogatories, Ronald Ostdiek states that the railroad right of way was acquired on April 23, 1998 for $1,782. *Id.* at 2. The railroad corridor is used for a pasture by a tenant on the property. *See id.* at 3. Mr. Ostdiek states that he is not aware of any interference with the use of the property. *Id.*

Also, the plaintiffs offer several general statements of undisputed fact that are not germane to the Court's analysis.[7]

II. LAW

Under Federal Rule of Civil Procedure 56, a grant of summary judgment is appropriate when the pleadings, affidavits and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. A fact is "material" if it could "affect the outcome of the suit under the governing law." *Id.* In resolving motions for summary judgment, the Court will not make credibility determinations and will draw all inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

The Rails-to-Trails Act, 16 U.S.C. §1247(d), "provides for the preservation of discontinued railway rights-of-way, by 'banking' the rights-of-way for possible future reactivation" and "authorizes interim use of the rights-of-way as recreational trails." Hash v. United States, 403 F.3d 1308, 1311 (Fed. Cir. 2005); *see also* Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 110 (1990) ("*Preseault I*"). "Congress created the process of railbanking to preserve, where possible, unused railroad rights of way for future

---
[7] Those facts relate to the plaintiffs' estoppel argument and involve the parties' positions on the statute of limitations issue with respect to other Trails.

11

rail service by temporarily converting the rights of way into recreational trails until they are again needed for rail purposes." *Fletcher v. Burlington N. and Santa Fe Ry. Co.*, 474 F.3d 1121, 1123 (8th Cir. 2007).

To establish a viable takings claim, a plaintiff must first establish that he or she had "a property interest for purposes of the Fifth Amendment." *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005). Second, if the court concludes that a cognizable property interest exists, it determines whether the Government's action amounted to a compensable taking of that interest. *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013).

It is well established that the operation of the Trails Act leads to a compensable taking where a plaintiff possesses a "state law reversionary interest[ ]" in land subject to a railroad's right-of-way that is "effectively eliminated in connection with [the] conversion of [the] railroad right-of-way to trail use." *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004); *see also Ladd v. United States*, 630 F.3d 1015, 1023-24 (Fed. Cir. 2010) (a Fifth Amendment taking occurs in a rails-to-trails case when the government, through the issuance of a NITU, destroys an individual's state law reversionary interest in property underlying a railroad right-of-way). That taking occurs "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU," for it is that action which "operates to preclude abandonment [of the railroad right-of-way.]" *Caldwell*, 391 F.3d at 1233; *Ladd,* 630 F.3d at 1023 (the issuance of the NITU blocks reversionary property interests and prevents the landowners from possessing their property unencumbered by the easement).

To determine whether a Fifth Amendment takings has occurred in a rails-to-trails case, the Court follows the three-part analysis established by the United States Court of Appeals for the Federal Circuit in in *Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc) ("*Preseault II*"). See *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009). Under *Preseault II*, the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement). *Id.*

Physical takings are compensable, even when temporary. See *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991) ("A taking can be for a limited term—what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute.") Where no trail use agreement is reached, the taking is temporary. See *Caldwell*, 391 F.3d at 1234; *Barclay v. United States*, 443 F.3d 1368, 1378 (Fed. Cir. 2006). "The duration of the taking goes to damages, not to whether a compensable taking has occurred." *Ladd*, 630 F.3d at 1025. "None of the rails to trails case precedent with respect to liability has required an additional showing by landowners of what they would have done with the land if they could access it." *Banks v. United States*, 138 Fed. Cl. 141, 150 (Fed. Cl. 2018)

13

(noting that consideration of multiple factors may be relevant to compensation but is immaterial to liability).

The NITU operates as a single trigger to several possible outcomes—it may trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked. *Caldwell*, 391 F.3d at 1234. Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment. *Id.* (stating in dicta that "[i]n these circumstances, a temporary taking may have occurred"); *see also Ladd,* 630 F.3d at 1015 (stating that a taking occurs on the issuance of a NITU, whether an agreement is reached or not). It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues. *Caldwell*, 391 F.3d at 1234.

The issue of the continued validity of *Ladd* is presently on appeal to the Federal Circuit. *See Caquelin v. United States*, 140 Fed. Cl. 564, 578 (Ct. Cl. 2018), *appeal docketed*, No. 2019-1385 (Fed. Cir. Jan. 9, 2019) ("*Caquelin II*"). In the first *Caquelin case,* the Court of Claims found, in reliance on *Ladd,* 630 F.3d at 1023, that a *per se* physical taking had occurred where a NITU issued and was in place for a six-month period, but no trail use agreement was ultimately reached. *Caquelin I,* 121 Fed. Cl. at 666. The Government appealed the ruling and, in a *per curiam* opinion, the Federal Circuit vacated the decision and remanded the case to the Court of Claims. *Id.* Without "prejudg[ing] the merits of the takings claim," the Federal Circuit instructed the lower court to develop the record and apply the multi-factor analysis the government advocated as a substitute for the *Ladd* decision. *Caquelin I* Appeal*,* 697 F. App'x at 1018-19 (Fed. Cir. 2017) (noting that the government had argued that blocking reversion for six months

called for the multi-factor analysis used for regulatory takings under *Penn Central,* 438 U.S. at 124, and *Arkansas Game,* 568 U.S. at 38-40 (2012)). *Id.* at 1019. The Federal Circuit acknowledged that the government's principal argument was that *Ladd* should be overruled *en banc*, and "[r]ecogniz[ed] the difficulty of adopting [the government's] approach while *Ladd* remain[ed] controlling precedent[,]." *Id.* It stated that "application of this court's decision in *Ladd* would lead to affirmance of the Court of Federal Claims' judgment in this case." *Id.* The Appeals Court wanted the litigation record in the case further developed before it decided "whether en banc review [would be] worth-while[,]" stating:

Perhaps en banc review might not be warranted, for example, if an appropriate multi-factor analysis were to lead to the same conclusion as the one *Ladd* drew—that an NITU like the one here constitutes a taking for reasons common to many rails-to-trails cases (leaving only the question of proper compensation, which is not at issue here).

*Caquelin I* Appeal, 697 F. App'x at 1020.

On remand, the Court of Claims again determined that, in a rails-to-trails case, a categorical physical taking occurs on the issuance of a NITU, regardless of whether a trail agreement is reached or the NITU results in trail use of the corridor. *Caquelin II*, 140 Fed. Cl. 564, 578 (Ct. Cl. 2018), *appeal docketed*, No. 2019-1385 (Fed. Cir. Jan. 9, 2019). It also reached the same result when considering the multiple factors set out in *Arkansas Game. Id.* at 584. The Government has appealed the Court of Claims' finding on remand and the case was argued on March 20, 2020. *See Caquelin II* Appeal, No. 2019-1385 (Fed. Cir. Mar. 20, 2019).

15

The STB has authority to regulate most railroad lines in the United States. *See* [49 U.S.C. § 702](). The ICC's (now STB's) jurisdiction over a rail line generally ceases once the line has been abandoned pursuant to a valid and effective abandonment certificate. *See Preseault I*, 494 U.S. at 5 n. 3. A railroad seeking to abandon any part of its railroad line must either (1) file an application to abandon or (2) file a notice of exemption to abandon the line. *See* 49 U.S.C. § 10903 (2012); *see also* 49 C.F.R. § 1152.50 (2017); *Arnold v. United States*, 137 Fed. Cl. 524, 551 (2018). "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." *Caldwell,* 391 F.3d at 1228–29.

As of December 24, 1996, the railroad must file a notice of consummation of abandonment with the STB within one year of the effective date of the notice of exemption permitting abandonment. 49 C.F.R. § 1152.29(e)(2); *see* 61 Fed. Reg. 67876–01, 67896–97 (Dec. 24, 1996) (adding § 1152.29(e)(2)). The STB retains jurisdiction over the right-of-way until the notice of consummation is filed. *Barclay,* 443 F.3d at 1376. The relevant STB regulation states that expiration of a NITU will "permit" a railroad fully to abandon the line, therefore indicating that an effective certificate of abandonment authorizes, but does not itself establish, complete consummation of the abandonment. *Baros v. Tex. Mexican Ry. Co.*, 400 F.3d 228, 236 (5th Cir. 2005). "Thus, 'an effective certificate of abandonment confers *permissive* authority on the railroad; until the railroad actually consummates an abandonment, none occurs, and the Commission retains jurisdiction over the railroad's right-of-way.'" *Id.* (quoting *Birt v. Surface Transp. Bd.*, 90 F.3d 580, 589 (D.C. Cir. 1996) (emphasis added in *Birt*)). Because the historical approach

16

wherein the STB determined whether an abandonment was consummated by evaluating the rail carrier's objective intent to permanently cease all transportation service on the line fostered uncertainty as to a particular line's status, the STB has required rail carriers to file a letter confirming consummation of abandonment with the agency since 1997. *Id.*

Until the Railroad takes action to consummate the abandonment—the STB continues to have jurisdiction over the right-of-way, just as it did before the NITU was issued. See *Balagna v. United States*, 145 Fed. Cl. 442, 445 (Fed. Cl. 2019); *Arnold,* 137 Fed. Cl. at 556; *Farmers Coop. Co. v. United States*, 100 Fed. Cl. 579, 583 (2011) (stating "despite Plaintiffs' quandary, it is not this court's province to answer Plaintiffs' question, "What then?," or address how they might best extricate themselves from the consequences of the railroad's failure to file the requisite notice of consummation, even though its abandonment of the rights-of-way seems evident under state law" and explaining that "[i]n a rails-to-trails takings case, the issue is not whether STB jurisdiction continues or whether the railroad retains a property interest upon the expiration of a NITU, but whether the Government has taken any action that forestalls the vesting of the underlying landowners' property rights").

III. DISCUSSION

The Court finds the Government has not shown it is entitled to judgment as a matter of law on these plaintiff's temporary takings claims. This Court earlier found that the issuance of the NITUs was a taking, at least with respect to property that the railroad had not owned in fee simple. That ruling is law of the case. The parties proceeded on that assumption throughout the case.

It is well established that the law at present requires just compensation for the taking, even if temporary, that comes as the result of a NITU. The Court is unable to draw the conclusion that these plaintiffs suffered no damages from vague concessions in answer to interrogatories. Although the plaintiffs may acknowledge there is presently no interference on their property rights, that is not to say there was never any interference.

The Court rejects the Government's argument that the plaintiff's claims fail for failure to prove causation. The STB's issuance of a NITU caused an encumbrance—it created a new easement that prevented reversion to an adjoining landowner. The encumbrance is the cause of some damage—either a temporary prevention of an unencumbered sale, prevention of abandonment by the railroad, a delay in reversion, an or a diminution in value. The amount of any such damages remain to be determined by an appraisal. Though any diminution in value during the time the property was encumbered may be low or even negligible, the Court cannot say as a matter of law that the temporary encumbrance had no monetary value at all. The issue relates to damages, not to liability.

Issues of fact remain on numerous issues. The record is silent or opaque on issues of the fact or timing of any abandonment, the interests conveyed by deeds or conveyances, the nature, terms, or condition of acquisitions or ownership rights, and the nature and extent of any encumbrances on these parcels.

This action has been pending for over twenty years and the Court is not inclined to let it linger any longer. Though the Government disclaims reliance on the arguments it makes in *Caquelin II*, it is apparent to the Court that it seeks to challenge the holdings in *Ladd* and/or *Caldwell*. The Court will not endeavor to anticipate the Federal Circuit's

decision in *Caquelin II*, but will presently follow the law as it is. Under *Caldwell* and *Ladd*, a NITU is a categorical physical taking, for which the plaintiffs deserve just compensation. *See Banks,* 138 Fed. Cl. at 149-51 (denying the government's request to await a trial decision in *Caquelin* and granting summary judgment on liability for the plaintiffs for a temporary taking).

Also, the Court agrees with the Federal Court of Claims that the application of the *Arkansas Game* factors would not lead to a different result. *See Caquelin II*, 140 Fed. Cl. at 578, *appeal docketed*, No. 2019-1385 (Fed. Cir. Jan. 9, 2019). Accordingly, the Court finds the Government has not sustained its burden to show that it is entitled to judgment as a matter of law on the temporary takings claims asserted by these plaintiffs. Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (Filing No. 490) is denied.

Dated this 31st day of March 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge